IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs May 4, 2010

## TOBIAS JOHNSON v. STATE OF TENNESSEE

**Direct Appeal from the Criminal Court for Shelby County**
**Nos. 04-00221, 03-07370-71, 05-02372     James C. Beasley, Jr., Judge**

---

**No. W2009-01365-CCA-R3-PC  - Filed January 28, 2011**

---

On May 25, 2007, the petitioner, Tobias Johnson, pled guilty to first degree murder in the perpetration of a felony; two counts of rape, Class B felonies; and incest, a Class C felony. He received a negotiated sentence of life in the Tennessee Department of Correction, with the possibility of parole, for the first degree murder conviction.  As a Range I, standard offender, he received eight years for each of the rape convictions and three years for the incest conviction, all sentences to be served concurrently with his life sentence.  The petitioner filed a petition for post-conviction relief, which the post-conviction court denied. On appeal, the petitioner argues that trial counsel provided ineffective assistance when they (1) did not timely litigate an issue regarding the state's loss of the audio tape of the petitioner's August 27, 2003, interrogation; (2) failed to allege in a motion to suppress that the state violated the petitioner's right to remain silent; and (3) misadvised the petitioner regarding his release eligibility.  The petitioner further argues that he did not enter his guilty plea knowingly, intelligently, and voluntarily.  Following our review, we affirm the denial of post-conviction relief.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

J.C. MCLIN, J., delivered the opinion of the court, in which ALAN E. GLENN and D. KELLY THOMAS, JR., JJ., joined.

Lance R. Chism, Memphis, Tennessee, for the appellant, Tobias Johnson.

Robert E. Cooper, Jr., Attorney General and Reporter; Clarence E. Lutz, Assistant Attorney General; William L. Gibbons, District Attorney General; and Damon Griffin, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

# Background

## *Guilty Plea*

From 2003 to 2005, Shelby County grand juries indicted the petitioner, Tobias Johnson, in five cases. In case number 03-07370, the grand jury indicted him for the rape of a child, A.H., which is a Class A felony. In case number 03-07371, the grand jury indicted the petitioner for the aggravated rape of M.M., a Class A felony. In case number 04-00221, the grand jury indicted the petitioner for (1) the murder of T.K. in the perpetration of a kidnapping; (2) the murder of T.K. in the perpetration of child abuse; (3) especially aggravated kidnapping, a Class A felony; and (4) aggravated child abuse, a Class B felony. In case number 04-007733, the grand jury indicted the petitioner for the aggravated rape of C.J., a Class A felony. In case number 05-02372, the grand jury indicted the petitioner for incest, a Class C felony.

On May 25, 2007, pursuant to a negotiated plea agreement and under the authority of *North Carolina v. Alford*, 400 U.S. 25 (1970), the petitioner entered best interest guilty pleas in case number 04-00221, to murder in the perpetration of a kidnapping, for which he received a life sentence in the Tennessee Department of Correction, with the possibility of parole; in case numbers 03-07370 and 03-07371, to the reduced charges of rape, Class B felonies, for which he received eight years as a Range I, standard offender for each; in case number 05-02372 to incest and received three years as a Range I, standard offender. The court ran the sentences concurrently. The state dismissed counts two through four of case number 04-00221 and dismissed case number 04-00733. At the guilty plea hearing, the state submitted that it would have proved the following facts had the matter proceeded to trial:

> The facts giving rise to indictment number 03-07370 [are] that on the dates between February the 24th and February 27th[,] that [the petitioner] did unlawfully and intentionally sexually penetrate an [A.H.], a person who was less than thirteen years of age. This would be a violation of Tennessee Code Annotated 39-13-522, against the peace and dignity of the State of Tennessee. It did happen here in Shelby County, Tennessee.

> Upon his plea under indictment number 03-07371 to the charge of rape for the eight years the facts would be that between August 16th and August 17th of 2003, he intentionally and forcibly, while armed with a knife, sexually penetrate [M.M.], in violation of 39-13-502[;] it did occur here in Shelby County, Tennessee.

> The facts giving rise to indictment number 04-00221, which is the murder in the perpetration of a felony, would be that on August 23, 2003, [the

petitioner] forcibly took [T.K.] from her scooter as she was riding on the sidewalk in front of 3558 Mt. Terrace, [which is] here in Shelby County Tennessee.

[T.K.] was screaming. [The petitioner] carried her and her scooter to the rear door of 3558 Mt. Terrace. He covered her mouth with his hand to prevent her screams from being heard as he carried her into the house.

Once [the petitioner] had [T.K.] in the rear bedroom he placed his hand over her nose and mouth until she suffocated to death. After killing her, he took her body and placed her in the attic.

On August 27th of 2003, Dr. Smith ruled the death of [T.K.] a homicide as the result of suffocation[, and] on August 27th of 2003 [the petitioner] made a statement admission to killing [T.K.]

Facts giving rise to the indictment 04-00733 . . . [which] was nol-prossed . . . are encompassed in the facts of 05-02372, in that they involved the same incident, which was[] that on August the 20th of 2003[,] Tobias Johnson did unlawfully and knowingly engage in sexual penetration with his sister, [C.J.], in violation of Tennessee Code Annotated 39-15-302. That did occur here in Shelby County, Tennessee.

*Post-Conviction Hearing*

The petitioner filed a timely *pro se* petition for post-conviction relief on December 3, 2007. The post-conviction court appointed counsel to represent the petitioner and held a hearing on May 14, 15, 19, and 22, 2009.

Memphis Police Detective Jonas Holguin testified that on August 26, 2003, while working uniform patrol, he arrested the petitioner and transported him to 201 Poplar Avenue. He did not advise the petitioner of his rights because his duty was to apprehend the petitioner and not to question him.

Sergeant Thomas Helldorfer testified that he was in the Memphis Police Department's homicide division on August 27, 2003. He was the case coordinator for the investigation of T.K.'s death. Sergeant Helldorfer recalled that the sex crimes unit had initially interviewed the petitioner after the police arrested him. He testified that he escorted the petitioner from the jail to the sex crimes unit at approximately 7:30 a.m. He left the petitioner there and returned to that office at 9:30 a.m. The petitioner was in a room with Sergeant Ivory Beck, who had a tape recorder. When Sergeant Helldorfer arrived, Sergeant Beck began recording

the interview and asking the petitioner about the sex crimes for which he was a suspect. Sergeant Beck advised the petitioner of his *Miranda* rights "maybe a couple of moments, or minutes into it." Sergeant Helldorfer identified a transcript of the recorded interview and explained that the sex crimes unit recorded interviews, which a transcriptionist would later transcribe. He testified that the transcript accurately portrayed the interview.

The transcript, admitted as Exhibit 1 to the hearing, reflected the following transaction:

Q: We mentioned about the little girl. It's been on the news. Tell me about that.
A: (Inaudible). . .

Q: (Inaudible) . . .
A: (Inaudible) talk about it right now.

Q: You want to sit back and wait a minute?
A: (Inaudible) . . .

Sgt. Helldorfer: (Inaudible) . . . you don't really know who Sgt. (Inaudible) is. You know that. Like I told you, Tobias, that little girl, why you gonna (Inaudible) . . . things happened. And it wasn't what you wanted to happen.

(Inaudible conversation . . .)

Q: Let me assure you, I think what happened was an accident. I've just got to know how it happened. So it shows what I think happened. Okay? You were there, you know. You know it was an accident. And all I've got to do is (Inaudible) . . . cause that's how I can help you. Okay? I'll get you some water.

Tobias (Inaudible) go ahead and tell me what happened. That's the best thing to do. You know (Inaudible) . . . and you didn't mean for her to get hurt. But I'm telling you Tobias, we've got to bring some closure to that little girl. That's the thing man. That's why we're here. That's why I came down.
A: If I could just see my mama.

Q: You're gonna see your mama. I told you that. We're working on getting your mama. (Inaudible) . . . And like I said, we already know things happen.

That was an accident. And all we're trying to do is find out how it happened. Okay? How did you feel when it happened?

A: I don't want to talk about it.

Q: Would you feel more comfortable if mom was in here? Could you talk about it then? Why? Why would you want your mom sitting here in that chair and you telling her what happened? What do you think your mom's gonna do?

A: If I could just talk to my mom for a second (Inaudible) . . . that would make all the difference to me.

Q: What you want to tell your mama?

A: I just want to talk to her.

Q: You're gonna get to talk to her. You're gonna talk to your mother. But why you want your mama sitting here? So we have to call 911 to get her some medical attention? Is that what you want?

A: No sir.

Q: You're gonna talk to your mom.

A: I'm just saying before I go any further in my statement, I'd just like to talk to my mom. That's all.

Q: Well the problem we've got (Inaudible) . . . we're having trouble locating her. That's the only thing. Now we can be here all day trying.

A: I've got some numbers you can reach her. (Inaudible)

. . . .

Q: We'll see what we can do (Inaudible) . . . I don't know what you've seen on TV, if you've seen anything about (Inaudible) . . . Have you talked to anybody about all this stuff? Obviously, there's a little girl that died. Okay? And there's no doubt in my mind it was an accident. You did not intend for this to happen. But in order for me to be able to go to my bosses and explain what happened, you have to tell me. What I believe happened, and what I can tell them are two different things. Okay?

So . . . I know you go to church. You're not a bad person. You've got some drug problems. Okay? This little girl was an accident. There's no doubt in my mind what happened was an accident. You know the little girl. You knew

her, didn't you? She knew you. It's an accident. But all you need to do is tell us what happened so I can explain to them, so we can work through this.

It's not gonna go away. And I know if you could turn the clock back, you'd turn the clock back. There's no doubt in my mind you would. But we can't turn it back. So what we have to do is work through this. An accident is a big difference from intending to hurt somebody. There is a big, big difference. And I have to be able to show my bosses the difference on paper. I have to show them what you did and have it all fall into place. Cause you know what? What you did and the accident is all gonna show up. It all comes together. The truth is gonna be together.

This was an accident. She wasn't stabbed, was she? No. She wasn't shot, was she? You didn't rape her, did you? Exactly. This was an accident. All I need you [to] do is give me the words. Tell me . . . what I'm just telling you back. I already know this. I know what happened, but you've got to tell me what happened. What I know is through science. Okay? Through the examination. And I know what didn't happen. I don't know what happened.

You didn't stab her, you didn't shoot her, you didn't rape her. Right? Okay. So let's fill in the pieces. What did happen? An accident is an accident. And I even know about that little pink, what [was] it, scooter type thing she was riding. I even know where you put it. And your story, what you have to tell me, when you tell the truth, it's gonna fall right into place. Everything will be the way it is, the way it actually happened. Cause like I said, you didn't hurt her. Right? And it's gonna show. When you tell me what happened, it's gonna show that. I already know that. But you've got to tell me. And I've got to then turn around and tell my bosses.

And this is what I'll do. I'll put it on paper. We'll do the statement and they can read for themselves how this happened. And they'll see it was an accident. There ain't no doubt in my mind.
A: Help me to see my mom. I can do whatever y'all want to do.

. . . .

Sgt. Helldorfer: Let me ask you this. (Inaudible) cause I don't know the facts. You know the facts. Okay? Are you telling us, giving your word that if we can track her down and talk to her that you're gonna tell me the truth?
A: Yes sir.

-6-

. . . .

Sgt. Beck: We're gonna stop the tape.

**Tape stopped.**
**Tape restarted.**

**This is Sgt. Beck. A continuation of [the petitioner's] statement. The time now is 12:41 p.m.**

Q: Okay, Tobias, when we last talked, you advised that you wanted to speak with your mom. Did that happen?
A: Yes.

Q: You did speak with your mom?
A: Yes sir.

Q: How long was that?
A: About five minutes.

Q: Okay. Are you ready to talk to us now about . . . ?
A: Yes sir.

Q: . . . the little girl at your house?
A: Yes sir.

When asked why he continued to question the petitioner after he said that he did not want to talk about T.K., Sergeant Helldorfer replied that the petitioner could not "invoke his mother as the reason for us to stop talking." He said that he did not have to stop questioning a suspect until the suspect requested a lawyer. Sergeant Helldorfer testified that the petitioner spoke with his mother on the phone and then gave a statement in which he admitted to killing T.K. After getting off the phone, the petitioner did not indicate that he did not want to talk nor did he request a lawyer. Sergeant Helldorfer said that he did not know what happened to the audio tape of the initial interview after the transcriptionist transcribed it.

Sergeant Helldorfer further testified that he took a written statement from the petitioner after the oral interview. Before taking the written statement, he advised the

-7-

petitioner of his rights again. The petitioner initialed each page of the statement and signed it at the end.

Counsel A[1] testified that the general sessions court appointed him to represent the petitioner, and the criminal court also appointed him when the cases reached that court. He said that he and Counsel B worked together on all of the petitioner's cases, although they were appointed to separate cases with the exception of the murder indictment, for which both were appointed. He agreed that he filed a motion to suppress in general sessions court, which he characterized as alleging sufficient grounds for a suppression hearing. In addition, he said that prior to discovery, it would have been difficult to make more specific allegations. He did not recall having a suppression hearing in general sessions court. Counsel A recalled speaking with the petitioner about the police interrogation, but he could not recall whether the discussion occurred prior to the preliminary hearing.

Counsel A stated that the defense filed another generic motion to suppress all statements in criminal court. He agreed that the defense filed an amended motion to suppress in February 2007, which "submit[ted] that as early as [the petitioner's] first statement he made a clear request for an attorney." In the amended motion, the defense also alleged that the state had destroyed the only tape available of the August 27, 2003, interrogation and that the court should suppress the statement as a remedy. When asked why he did not include an argument that the police violated the petitioner's right to remain silent, Counsel A stated, "I'm sure it would have all come out at the hearing." He further stated that the claim that "the statement was illegally taken and taken unconstitutionally" was "out there." Counsel A testified that "what was filed [was] based upon sound defense strategy and . . . on what [they] had in the discovery, as well as conversations with [the petitioner] at the time." When asked why he waited until February 2007 to file the amended motion to suppress, Counsel A said that the petitioner's case was high profile and "needed to grow some whiskers, so that the media wouldn't be around as much." Additionally, he said that the chance of settling the case improved as time passed and that settling the case was preferable to a jury finding the petitioner guilty of a capital crime. Counsel A testified that the court's docket and the state contributed to the length of time before trial.

Counsel A recalled that the petitioner approached him before the beginning of the scheduled hearing on the amended motion to suppress his statements to say that he wanted to plead guilty. He further recalled that the petitioner knew he had the right to carry through

---

[1] Two attorneys represented the petitioner at the trial level. The trial court appointed Counsel A to represent the petitioner in case number 03-07370 and as first chair in case number 04-00221. The trial court appointed Counsel B to represent the petitioner in case numbers 03-07371 and 04-00733 and as second chair in case number 04-00221.

with the suppression hearing rather than plead. He said that the petitioner was "very aware of everything" and was inquisitive. Counsel A said that the petitioner had adequate time to consider whether to plead and to talk with his attorneys and family. He testified that he told the petitioner that he would be eligible for parole after serving fifty-one years, but that he could not guarantee that the parole board would release the petitioner at that point. He said that the judgment sheet erroneously reflected a release eligibility of thirty percent, but he did not tell the petitioner that he would be eligible for parole after serving thirty percent of fifty-one years. Counsel A testified that the plea waiver form showed thirty percent release eligibility for the other three charges but not for the murder charge. He said that the petitioner agreed to plead guilty under *North Carolina v. Alford* because he disagreed with the state's factual basis for the offenses. Counsel A stated, "And that, again, goes to my further belief that [the petitioner] understood what he was doing clearly in light of the fact that he understood the difference between [*Alford* and] a regular guilty plea." He said that he "[felt] very comfortable" with the fact that the petitioner understood what he was doing by pleading guilty.

Counsel A testified, "[W]e never got to finish the job . . . because [the petitioner] decided to plead guilty." He said that the state's plea offer had not been on the table before, and he felt that the issues they planned to argue in the suppression hearing influenced the state to make the offer. He believed the arguments in favor of suppression had merit, but if the petitioner had asked what the odds of winning the motion were, he would have told him that "most motions to suppress are denied." Counsel A stated that the case against the petitioner had many problems other than the petitioner's statements, including DNA and fingerprint evidence and the fact that T.K.'s body was in the petitioner's family's house.

Regarding the defense strategy for the murder case, Counsel A testified that they would have argued at trial that T.K.'s death was accidental. Additionally, they were pursuing a mental health defense and had the petitioner evaluated because of his reported black outs and low serotonin levels. Counsel A recalled that the petitioner denied all of the allegations in the other cases against him. He testified that the petitioner complained about the conditions in the jail and recalled that the petitioner might have spent time in solitary confinement.

Counsel B testified that he represented the petitioner in general sessions and criminal court. He recalled that the defense filed a "boiler plate" motion to suppress statements in general sessions court to "make the [c]ourt aware of what [their] issue was." He said that the petitioner told them that he requested an attorney during his interrogation and told the police that he did not want to speak with them. Regarding the amended motion to suppress in the murder case, filed in February 2007, Counsel B said that he remembered talking with Counsel A about their strategy, but Counsel A prepared the motion. He said that if they left

out an allegation, it was either an omission or a strategic decision. He explained that he tried not "to show the prosecutor what [his] cards are in the beginning." When asked why they did not file the amended motion to suppress earlier, Counsel B testified,

> Possibly, because we wanted to make sure that [the petitioner's] mental state was correct. We wanted to make sure we had all the evidence in the case. We had not only a capital case, but I think, three rape cases that we were dealing with. [There were] a lot of issues in this case, a lot of things that we had to walk through to determine just what we wanted to do and where and evidently it took that long to get through all those issues.

Counsel B recalled that the defense asked for the missing audio tape of the petitioner's August 2003 interrogation at the general sessions level. They filed a motion to compel the state to produce the tape in September 2006, but the state was never able to locate it.

Counsel B said that they did not litigate the motion to suppress because they settled the case first. While he had spoken to the state about possible offers prior to May 25, 2007, that day was the first time the state presented a formal offer of life with the possibility of parole. Counsel B testified that "[he] felt like that was a good resolution and [he did not] like putting people on death row."

Counsel B testified that the petitioner complained about his housing and that the jailers were "excruciatingly mean to him." The petitioner told him that he received threats about what would happen to him in the Tennessee Department of Correction because he was a "child killer." Counsel B said that the petitioner had escorts to protect him when he went to visit his attorneys, and they obtained video surveillance of the petitioner in the jail because of an allegation that someone had beaten or shoved him in a stairwell.

Counsel B further testified that he told the petitioner that he would be eligible for parole on the life sentence after fifty-one years. He did not tell the petitioner that the release eligibility was thirty percent. He said that he told clients who asked what their chances were of winning a motion to suppress that he would make the arguments but that the judge would decide. Counsel B denied ever discussing the petitioner's case with other clients.

Memphis Police Sergeant Ivory L. Beck testified that he interviewed the petitioner on April 23, 2003, regarding a child abuse case. He interviewed the petitioner again on August 26, 2003, along with Sergeant Pride, for thirty to forty-five minutes. The petitioner did not make any statement about T.K. that day. On August 27, 2003, he interviewed the petitioner with Sergeant Helldorfer. Sergeant Beck recalled that he read the petitioner's rights to him before the interviews and that the petitioner never requested an attorney. He further recalled

that the petitioner did not want to talk to him and Sergeant Helldorfer about T.K.'s death until he had spoken with his mother. Sergeant Beck acknowledged that the petitioner said he did not want to talk about T.K., but they continued questioning him because "[i]t was still an investigation" and there was not any "reason to stop talking about it." He said that when they turned the tape recorder off, they went to find the petitioner's mother while the petitioner sat alone in the interview room. Sergeant Beck testified that he did not know what happened to the audio tape of the August 27 interrogation but that someone gave it to the homicide division along with the typed statement. He said that he did not recall the last time that he saw the tape.

Memphis Police Sergeant Linda Pride testified that she was with Sergeant Beck on August 26, 2003, during part of his interview with the petitioner. She recalled hearing the petitioner say that he wanted to speak with his mother. She did not hear him say that he wanted an attorney.

The petitioner testified that he pled guilty on May 25, 2007, because of "all the harsh treatment [he] was enduring as a pre-trial detainee locked down in 201, that was because of [his] previous attorneys not making the efforts to defend [him] according to the line of strategies that [he] had asked them to defend [him] with." The petitioner said that he wanted his attorneys to move to suppress his statements because the police forced him to make the statements. He also wanted them to request a change of venue, to move to have the news media excluded, to move for a speedy trial, and to request a bill of particulars. The petitioner said that he was unhappy with the mental health defense that his attorneys wanted to pursue because they "tried to insinuate that [he] was retarded."

The petitioner said that he wanted to go to trial to prove his innocence, but his treatment as a pre-trial detainee in the Shelby County Jail forced him to plead guilty. He also said that he was not "able to correspond or have family relations, or . . . able to communicate with [his] family[,] to receive incoming mail, property[,] and things of that nature" and that "[he] was under great stress, physical and mental abuse[.]" He said that officers threatened his family. The petitioner testified that in-house informants interrogated him and reported their conversations to on-duty officers. He said that one of the informants was Counsel B's client. The petitioner testified that he wanted to tell the trial judge that Counsel B had a conflict of interest by representing both the petitioner and the informant, but Counsel B would not let him speak with the judge. The petitioner said that eight to nine officers from the detention response team assaulted him when he returned to the jail after his interrogation by Sergeants Helldorfer and Beck. He said that people assaulted him "countless times" while he was in jail. The petitioner testified that in response to the assaults, his attorneys told him that he would be videotaped anytime that he was transported by the detention response team, but he believed that the video equipment was turned off whenever he was beaten. The

-11-

petitioner further testified that his food was poisoned with bugs and staph infection. He said that he complained to jail authorities and informed his attorneys of his treatment.

Regarding his interrogations by Sergeant Beck and Sergeant Helldorfer, the petitioner testified that he told Sergeant Beck on August 26 that he wanted to speak with an attorney and his mother and that he did not want to talk with him. He told both sergeants on August 27 that he wanted to speak with an attorney and his mother. He told them that he did not want to talk with them. The petitioner said that Sergeant Helldorfer told him that he did not need an attorney. When he spoke with his mother, his mother told him about T.K.'s body being found in their house and that she had called the police after finding her scooter. He asked her to retain a lawyer for him. The petitioner said that after he spoke with her, he told the sergeants again that he wanted a lawyer. He testified that he answered their questions because he "was in fear of [his] life."

The petitioner testified that the audio tape of his August 27, 2003, statement would have revealed that he asked for an attorney several times. He said that it was "ridiculous" that his attorneys did not litigate the motion to suppress over the four years that his case was pending. He said that if the court had granted the motion to suppress, it "would have shown that [he] was being framed."

The petitioner testified that on May 25, 2007, he thought he was going to court for a suppression hearing, but his attorneys told him that they were there "for some sort of meeting." He said that he asked his attorneys what the state's offer was if he decided to plead guilty that day. The petitioner said that he was not serious, and his asking was a "call for help" because he was "hoping for some sort of efforts on their behalf in trying to say that they were pursuing some sort of strategy in defending [him]." After his attorneys talked to the state about an offer, they returned "jolly and happy" and told him that the state was offering life with the possibility of parole at thirty percent. He said that Counsel B told him, "[Y]ou're going to take something." When he told them that he wanted to ask the judge for new attorneys, his attorneys responded that he was not ready to go into the courtroom yet. The petitioner said that he felt that they were going to "delay [him] again" and that taking the plea was the "only choice of [ever] getting out of here." He testified that he told his attorneys that his life was in danger and said that he "was compelled to go forward with the plea bargain." The petitioner said that both of his attorneys told him that he would serve thirty percent of fifty-one years and that he would probably end up on death row if he did not take the plea. He felt coerced because his attorneys said that they would not defend him because he had admitted to them that he was guilty, but he denied that he admitted guilt to them. The petitioner also said that he was suffering from headaches and manic depression on the day of his plea because he had stopped taking medication and that he was starving and fatigued.

The petitioner testified that his attorneys prolonged the case and "deprived [him] of a fast and speedy trial, so that they could continuously gain funds from the state by representing [him]."

Assistant District Attorney General Patience Branham testified that she handled the case against the petitioner from its inception. She said that Counsel A brought the issue of the missing tape to her attention, and she unsuccessfully tried to locate the tape. Ms. Branham stated that "[t]he last [she] knew it was in the possession of Sergeant Beck."

The post-conviction court denied relief after finding that counsel were effective and that the petitioner's plea was voluntary. The post-conviction court found that the petitioner did not unequivocally invoke his right to stop questioning during the August 27 interrogation, and therefore, the petitioner's counsel were not ineffective for failing to present that issue in their motion to suppress. Furthermore, the post-conviction court concluded that the petitioner's issue regarding counsel's delay in litigating the motion to suppress was without merit because the petitioner decided to plead guilty rather than go through with the suppression hearing. The court accredited counsel's testimonies that they did not tell the petitioner that he would be eligible for parole after serving thirty percent of fifty-one years. The court also determined that the petitioner's plea was voluntary after finding that he did not present proof of incompetence at the time of the plea or of oppression while in the jail.

**Analysis**

I. Ineffective Assistance of Counsel

The petitioner contends that trial counsel provided ineffective assistance when they (1) did not timely litigate an issue regarding the state's loss of the audio tape of the petitioner's August 27, 2003, interrogation; (2) failed to allege in a motion to suppress that the state violated the petitioner's right to remain silent; and (3) misadvised the petitioner regarding his release eligibility.

To establish the ineffective assistance of counsel, the petitioner bears the burden of proving that (1) counsel's performance was deficient and (2) the deficient performance prejudiced the defense rendering the outcome unreliable or fundamentally unfair. *Strickland v. Washington,* 466 U.S. 668, 687 (1984). *See also Arnold v. State,* 143 S.W.3d 784, 787 (Tenn. 2004). Deficient performance is shown if counsel's conduct fell below an objective standard of reasonableness under prevailing professional standards. *Strickland,* 466 U.S. at 688. *See also Baxter v. Rose,* 523 S.W.2d 930, 936 (Tenn. 1975) (establishing that representation should be within the range of competence demanded of attorneys in criminal cases). A fair assessment of counsel's performance "requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time."

*Strickland,* 466 U.S. at 689. *See also Nichols v. State,* 90 S.W.3d 576, 587 (Tenn. 2002). Deference is made to trial strategy or tactical choices if they are informed ones based upon adequate preparation. *Hellard v. State,* 629 S.W.2d 4, 9 (Tenn. 1982). The fact that a particular strategy or tactical decision failed does not by itself establish ineffective assistance of counsel. *Goad v. State,* 938 S.W.2d 363, 369 (Tenn. 1996). Once the petitioner proves that counsel's representation fell below a reasonable standard, the petitioner must also prove prejudice. *Strickland,* 466 U.S. at 694. In relation to a guilty plea, the petitioner must show a reasonable probability that, but for the errors of his counsel, he would not have pled guilty and would have insisted on going to trial. *See Hill v. Lockhart,* 474 U.S. 52, 59 (1985); *Adkins v. State,* 911 S.W.2d 334, 349 (Tenn. Crim. App. 1994).

The petitioner bears the burden of proving the factual allegations that would entitle the petitioner to relief by clear and convincing evidence. Tenn. Code Ann. § 40-30-110(f). We review the post-conviction court's factual findings underlying a claim of ineffective assistance of counsel under a *de novo* standard with a presumption that those findings are correct – unless the preponderance of the evidence establishes otherwise. *State v. Burns*, 6 S.W.3d 453, 461 (Tenn. 1999). This court may not re-weigh or reevaluate the evidence, nor substitute its inferences for those drawn by the post-conviction court. *State v. Honeycutt*, 54 S.W.3d 762, 766 (Tenn. 2001). However, the post-conviction court's conclusions of law – such as whether counsel's performance was deficient or whether that deficiency was prejudicial – are reviewed under a *de novo* standard with no presumption of correctness. *Fields v. State*, 40 S.W.3d 450, 457 (Tenn. 2001) (citations omitted).

Regarding the motion to suppress, trial counsel testified that they filed a generic motion to suppress all statements as early as the preliminary hearing and actively pursued the missing audio tape. They testified that litigating a capital case along with several rape cases took time, and they did not intentionally delay filing the amended motion to suppress. Furthermore, they testified that they were prepared to litigate the motion on the day that the petitioner decided to plead guilty. They said that if they had litigated the motion, they would have addressed the petitioner's alleged invocation of his right to remain silent, despite not making that specific allegation in the motion. In fact, Counsel B testified that part of his trial tactics was not to include all of his specific issues in the four corners of motions so as to not reveal his strategy to the state. They said that they explained to the petitioner that he would be foregoing the motion to suppress if he decided to plead guilty and that the petitioner apparently understood that and decided to plead anyway. The petitioner prevented litigation of the motion to suppress by pleading guilty and has not shown that he would have proceeded to trial if his attorneys had litigated the matter earlier. Therefore, his arguments regarding the timing and content of the motion to suppress are without merit.

The post-conviction court accredited counsel's testimonies and found that they did not tell the petitioner that he would be eligible for parole after serving thirty percent of fifty-one years. The record does not preponderate against the post-conviction court's finding. Therefore, counsel did not perform deficiently when advising the petitioner what his release eligibility would be if he pled guilty. We conclude that the petitioner has not carried his burden of showing that counsel provided ineffective assistance, and he is without relief for this issue.

## II. Guilty Pleas

The petitioner contends that he entered his guilty pleas unknowingly, unintelligently, and involuntarily. When determining the knowing and voluntary nature of the guilty plea, the standard is "whether the plea represents a voluntary and intelligent choice among the alternative courses of action open to the defendant." *North Carolina v. Alford,* 400 U.S. 25, 31 (1970). *See also State v. Pettus,* 986 S.W.2d 540, 542 (Tenn. 1999). The reviewing court must look to various circumstantial factors, including:

> the relative intelligence of the defendant; the degree of his familiarity with criminal proceedings; whether he was represented by competent counsel and had the opportunity to confer with counsel about the options available to him; the extent of advice from counsel and the court concerning the charges against him; and the reasons for his decision to plead guilty, including a desire to avoid a greater penalty that might result from a jury trial.

*Blankenship v. State*, 858 S.W.2d 897, 904 (Tenn. 1993). In order for a guilty plea to be voluntary, the petitioner must have an understanding of the charges against him and the consequences of pleading guilty, including "the sentence that he will be forced to serve as the result of his guilty plea and conviction." *Id.* at 905. A petitioner's solemn declaration in open court that his or her plea is knowing and voluntary creates a formidable barrier in any subsequent collateral proceeding because these declarations "carry a strong presumption of verity." *Blackledge v. Allison,* 431 U.S. 63, 74 (1977).

Testimony at the post-conviction hearing revealed that the petitioner approached his counsel about pleading guilty. Over the course of several hours, they went over what the state's offer entailed, what his sentence would be, and what rights he would be waiving. Counsel A testified that he believed that the petitioner understood what he was doing, especially because the petitioner pleaded under *Alford*.

The guilty plea hearing transcript revealed that the trial court had an extended colloquy with the petitioner. The petitioner stated that he would tell the truth but he would not swear because it was against his religion. The court asked the petitioner if he understood

the charges for which the grand jury indicted him and the charges to which he was pleading, and the petitioner responded that he understood. The trial court informed him that he had the right to counsel, the right to a jury trial, the right to testify or not testify at trial, and the right to confront and cross-examine witnesses. The petitioner said that he wanted to waive his right to a jury trial and plead guilty because he felt that it was in his best interest. The trial court explained to the petitioner that his plea must be voluntary and explained the meaning of voluntary, and the petitioner responded that his plea was voluntary. When asked what it meant to plead under *Alford*, the petitioner responded, "It's in my best interest." The trial court explained the sentences for each conviction. Specifically for the murder conviction, she asked the petitioner whether he understood that the sentence was life with the possibility of parole and that parole was not guaranteed, and he agreed that he understood. He told the trial court that he was not satisfied with his attorneys, and he asked them why they sometimes gave him two different answers. Counsel A responded to him, and he did not ask any other questions. The trial court again asked him whether he understood that "[t]his [was] a very huge decision on [his] part," and he indicated that he wanted to continue with the plea. The trial court accepted his pleas and found that he gave them "freely, voluntarily, [and] understandingly."

In light of the testimony at the post-conviction hearing and the transcript of the guilty plea colloquy, we conclude that the petitioner voluntarily pled guilty. He initiated the pleas and testified that he felt it was in his best interest to plead guilty. He has not presented any evidence other than his own testimony that he was incompetent to plead guilty or that someone forced him to plead. Therefore, he is without relief for this issue.

**Conclusion**

Based on the foregoing reasons, we affirm the denial of post-conviction relief.

_____
J.C. McLIN, JUDGE